IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2003

## STATE OF TENNESSEE v. JAMES LUSK, JR.

**Appeal from the Criminal Court for Hamilton County**
**No. 238370      Rebecca Stern, Judge**

---

**No. E2003-00941-CCA-R3-CD**
**January 20, 2004**

---

The defendant, James Lusk, Jr., appeals from his twenty-five-year sentence imposed by the Hamilton County Criminal Court following his guilty plea to attempted first degree murder, a Class A felony. The defendant claims that the trial court failed to apply and weigh mitigating factors properly. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Bryan H. Hoss, Lee Davis, and David W. Wallace, Chattanooga, Tennessee, for the appellant, James Lusk, Jr.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry Allen Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the beating sustained by Donna Lusk, the defendant's then estranged wife, on September 26, 2001. At the sentencing hearing, Detective Chris Chambers of the Hamilton County Sheriff's Department testified that he went to Brown Middle School around 9:00 a.m. on September 26 after being told that a teacher had been attacked. After interviewing eyewitnesses, he determined that the defendant had entered the school through an unlocked gymnasium door. Two students told him they saw a hammer in the defendant's back pocket. Detective Chambers said the defendant encountered Carrie Ingle, who offered to take the defendant to the victim's classroom. Ingle told him that the defendant did not seem to be in a hurry and everything seemed okay. Ingle said that she knocked on the victim's classroom door and that another student opened the door from the inside, allowing the defendant to enter. Detective Chambers said students inside the victim's classroom saw the defendant carrying a hammer behind his back.

Detective Chambers testified that the students said that Mrs. Lusk told them to call 9-1-1 when she saw the defendant and that she tripped while trying to escape him. They told him that they heard the defendant yell "Bitch" and saw him beat the victim with a hammer while she was lying on the floor. Detective Chambers found the hammer used in the beating lying next to the victim's classroom's door, and the metal part of the hammer had blood and hair on it. The defendant later claimed that he only hit the victim with the wooden part of the hammer. Detective Chambers went to the hospital and saw that the victim had a black eye, two gashes in the back of her head, and injuries to her right thumb, left hand, and upper left arm.

Detective Chambers testified that he learned that the defendant had made threats to the victim and their son, James Lusk, and that they had obtained a restraining order against him. The son told him that he and the victim had hidden from the defendant after the victim left the defendant. He said the son had saved several threatening phone messages from the defendant, including one where the defendant said, "I hope you die too." Detective Chambers went to the defendant's residence and found a sign on the pool table that stated "under new management." He said that pictures of the victim had been cut up and that some of the son's clothes and trophies had been destroyed.

Detective Chambers testified that he obtained a note that the defendant admitted writing that stated, "She deserted Kristen and me, she had to pay. Bad girl Donna." Detective Chambers learned that the defendant wrote the note after beating the victim. The defendant had also left a message on the defendant's own answering machine that stated that he loved his daughter Kristin but that he had to go "spank mama." Detective Chambers said that after the Chattanooga and Hamilton County police failed to locate the defendant after the incident, the defendant walked into the police department with Jared Munson to report that his car was stolen. Detective Chambers said he learned that the defendant had parked his truck at a grocery store and then walked to Munson's house, telling Munson that his truck had broken down on the highway. Munson gave the defendant a ride to the highway where the defendant had claimed his truck had broken down, and, when they arrived, the defendant told Munson that his truck must have been stolen. Munson drove the defendant to the police station, believing that the defendant's truck had been stolen. Detective Chambers said that when he interviewed the defendant, the defendant stated that the victim had left him the previous weekend. He said the defendant was agitated and upset. He said that the defendant was mad at his whole family and had originally intended to injure or kill his son, but could not find him.

On cross-examination, Detective Chambers testified that the defendant had been married to the victim for twenty-four years and that they had three children. He said that the weekend before the victim's beating, she had told the defendant that she wanted a divorce and that she and two of their children left the defendant. Detective Chambers acknowledged that when taken into custody, the defendant answered all of his questions. On redirect examination, he testified that the defendant never expressed remorse and did not take any responsibility for his actions.

James H. Lusk, the defendant's and victim's son, testified that as a result of the victim's injuries from the attack, he had to help take care of his mother. He said his grandmother and his sister, Erica Lusk, also helped take care of the victim. He said that even though he had to help take

care of his mother, life was much better with the defendant gone. On cross-examination, he acknowledged that he and the defendant had argued several times before the defendant attacked the victim and that he was receiving anger management counseling.

The victim testified that she used to be a teacher but was not able to teach anymore. She said she and the defendant had argued before she told him that she wanted a divorce. She said that she was not able to do many of the things she used to do and that others had to help take care of her. She said she had to relearn how to walk and still needed to use a wheelchair at times. She said she was still afraid of the defendant and wanted him to be in prison for as long as possible. The record reflects that the victim was severely disabled due to her injuries.

Dr. Michael Cross, a psychiatrist, testified that he believed the defendant was mentally able to go to trial and that he would not have supported an insanity defense. He said, however, that the defendant suffered from depression and that his moods were erratic. He said that the night before the attack on the victim, the defendant went to the hospital with chest pains. He said the chest pains were likely a side effect of being anxious. He said the ferocity of the defendant's attack on the victim indicated how agitated he was that day. On cross-examination, Dr. Cross testified that one-quarter of the population suffers from depression at some point in their lives. He said that when the defendant is released from prison, it is possible that he will get depressed again and act in the same manner as he did when he attacked the victim.

The presentence report reflects that the then forty-nine-year-old defendant dropped out of school after the ninth grade but reported that he later received a GED. The defendant claimed to have suffered from anxiety and depression since 1985. He reported no alcohol or drug abuse throughout his life. The report shows that the defendant worked at Hertz Rental Car through August 2001. The report reflects that the defendant had no prior criminal record. He was, however, held in contempt during his divorce proceedings and sentenced to fifteen days in jail, to be served consecutively to his sentence in the present case.

The trial court sentenced the defendant as a Range I offender and imposed the maximum twenty-five-year sentence for his Class A attempted first degree murder conviction. It enhanced the defendant's sentence based upon the following factors in T.C.A. § 40-35-114: (6), the defendant treated the victim with exceptional cruelty; (7), the personal injuries inflicted upon the victim were particularly great; (10), the defendant possessed a deadly weapon during the commission of the offense; and (18), the defendant committed the offense while on school property. The trial court applied the catchall mitigating factor (13), finding that the defendant had no criminal history, that he was suffering from depression and anxiety, and that his guilty plea saved the court time and money. See T.C.A. § 40-35-113(13). It concluded, however, that this mitigator did not carry sufficient weight to reduce the sentence below the twenty-five-year maximum, stating that this was one of the worst domestic violence cases that it had ever seen. The defendant contends that the trial court should have applied mitigating factors (10), that the defendant assisted the authorities in locating the person involved in the crime, and (11), that the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to

violate the law motivated the criminal conduct. The defendant also challenges the weight that the trial court afforded the catchall mitigating factor (13).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

With regard to the defendant's argument that the trial court should have applied mitigating factor (10), that the defendant assisted the authorities in locating the person involved in the crime, the trial court stated that the defendant's going into the police station under a ruse that someone stole his car and then finding out he was wanted was hardly contemplated by the mitigating factor. The evidence supports the trial court. While in custody, the defendant told Detective Chambers to go ahead and shoot him when he asked the defendant to talk about the incident. He also told Detective Chambers that Chambers had "no sense in doing this" when the detective first attempted to interview him. Detective Chambers said the defendant was very belligerent during the interview. In addition, the defendant lied to Detective Chambers when he told him that he hit the victim with the wooden end of the hammer. The evidence shows that the defendant did not go to the police station to turn himself in and that the defendant's statements to the police were not intended to assist them but rather were meant to vent his anger and justify his behavior. The record supports the trial court's refusal to apply mitigating factor (10).

With regard to the defendant's argument that the trial court should have applied mitigating factor (11), that the defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct, the trial court stated that divorces occurred frequently and found that this was not an unusual circumstance. The defendant contends that there was no sustained intent to violate the law because the defendant was depressed, there was no complicated plot when he beat the victim, and a divorce after twenty-four years of marriage is very unusual.

This court has previously determined that factor (11) was applicable when a defendant shot a victim outside a bar following an altercation. In State v. Bobby Joe Russell, No. 03C01-9608-CR-00319, Polk County (Tenn. Crim. App. Sept. 16, 1997), app. denied (Tenn. Apr. 27, 1998), this court stated that factor (11) applies when an incident "arose from a rapidly arising set of circumstances that does not lend itself to a conclusion that a sustained intent existed relative to the homicide." The same is not true in the instant case because the wife informed the defendant that she was leaving him the weekend of September 22-23, several days before the attack. The defendant threatened both the victim and their son from the time of the victim's departure until the attack the following Wednesday. In addition, while the defendant was inside the school, he hid the hammer behind his back. Carrie Ingle told Officer Chambers that the defendant seemed calm when she led the defendant to the victim's classroom. We do not believe that the defendant acted impulsively in the altercation but with deliberation several days after the victim had left him. The defendant's continued threatening behavior toward the victim over the course of several days after she left him and his deliberate behavior while at the school show that the defendant had a sustained intent to violate the law. The record supports the trial court's refusal to apply mitigating factor (11).

Finally, with regard to the defendant's claim that the trial court failed to give appropriate weight to the catchall mitigating factor (13), the defendant argues that the trial court's weighing of factor (13) was insufficient because of his lack of criminal history and his decision to plead guilty, suggesting that these are sufficient to reduce the defendant's sentence. The trial court, however, found that this factor was outweighed because this case was one of the worst domestic violence

incidents the court had ever seen.  The trial court also stated that it believed that the defendant had been "mean" to his family for years, abusing them psychologically and emotionally.  The weight a factor receives is within the trial court's discretion.  See Moss, 727 S.W.2d at 237.  The evidence shows that the defendant beat the victim multiple times with a hammer inside a classroom filled with students.  The victim sustained massive physical injuries and will never be able to recover her prior mental faculties.  We conclude that the trial court did not err by refusing to give factor (13) sufficient weight to lower the defendant's sentence.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.


_____
JOSEPH M. TIPTON, JUDGE